## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | (Jointly Administered) |
| TOUCH AMERICA HOLDINGS, INC, | : | |
| *et al.* | : | Case No. 03-11915 (KJC) |
| Debtors | : | |

|  | | |
|---|---|---|
| | : | |
| BRENT WILLIAMS, Plan Trustee for | : | |
| Touch America Holdings, Inc. and its | : | |
| Affiliated Debtor Entities, as Successor | : | |
| In Interest to the Former Committee of | : | |
| Unsecured Creditors | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MARGARET A. MCGREEVEY, | : | |
| THOMAS G. TAYLOR, | : | |
| JOANNE BARKELL, | : | |
| PATRICK BURTON, | : | |
| ROSALIE BURTON, | : | |
| JAMES DUDLEY, | : | |
| JOSEPH MARTELLI, and | : | |
| LAWRENCE A. LOMBARDO | : | |
| Defendants | : | Adv. Pro. No. 08-51415 (KJC) |

## MEMORANDUM[1]

## BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Touch America Holdings, Inc. (the "Debtor" or "Touch America"), along with its

subsidiary and affiliates, filed voluntary chapter 11 bankruptcy petitions before this Court on

---

[1]This Memorandum constitutes the findings of fact and conclusions of law required by Fed. R.
Bankr. P. 7052. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and §157(a).

June 19, 2003.[2]  The Official Committee of Unsecured Creditors filed an adversary proceeding

on July 30, 2004 (Adv. No. 04-54840), which included a claim against the defendants in this

adversary proceeding (the "McGreevey Shareholders").[3]  Since confirmation of the Debtors'

Amended Liquidating Chapter 11 Plan (the "Chapter 11 Plan") on October 6, 2004 (main case

docket no. 2172), the adversary proceeding has been pursued by Brent Williams, who, pursuant

to the terms of the Plan, was appointed as the Plan Trustee (the "Trustee" or "Plaintiff").

Over an extended period of time, the parties reported to the Court about their attempts,

and supposed success, in resolving consensually certain issues in the adversary proceeding.  No

settlement has come fully to fruition.  On motion of the Plan Trustee and by Order dated August

26, 2008, the claim against the defendants was severed from adversary proceeding no. 04-54840,

commencing this adversary proceeding.  This Memorandum will resolve certain dispositive

motions filed by the defendants and the Plan Trustee while the case was pending at Adv. No. 04-

54840, but now part of this adversary proceeding as a consequence of the severing.

### PROCEDURAL BACKGROUND
### AND PENDING MOTIONS

This case has its origins in a Montana corporation known as Montana Power Company

("Montana Power"), a holding company of energy and telecommunications business enterprises.

In 1997, Montana Power's board of directors (the "MP Board") decided to refocus the

company's business holdings from energy to telecommunications and voted to sell certain assets

---

[2]By order dated June 23, 2003 (main case docket no. 27), the Court approved joint administration of the bankruptcy cases filed by the following debtors: Touch America, Inc., Entech LLC, Touch America Purchasing Co., LLC, Touch America Intangible Holding Co., LLC, Sierra Touch America, LLC, and American Fiber Touch, LLC.

[3]The "McGreevey Shareholders" consist of Margaret A. McGreevey, Thomas Taylor, Joanne Barkell, Patrick Burton, Rosalie Burton, James Dudley, Joseph Martelli and Lawrence A. Lombardo.

related to electrical generation.[4]   Later, in March of 2000, the MP Board approved a more comprehensive plan to sell its remaining energy-related assets (the "Divestiture") and, to facilitate the Divestiture, planned to restructure the corporate entities (the "Restructuring") by creating new subsidiaries, including Touch America.

In August 2001, after certain asset sales had been completed, but prior to the Restructuring, a group of Montana Power shareholders filed an action in Montana state court, styled *McGreevey v. The Montana Power Co.*, case no. 01-141, alleging claims arising from the 1997 sale of the electrical generation assets and later asset sales completed as part of the Divestiture (the "McGreevey Litigation"). The McGreevey Litigation was removed to the United States District Court for the District of Montana, where it remains pending.[5]

In February 2002, Montana Power completed the Restructuring and sold its remaining utility assets to a company known as NorthWestern Corporation. Less than 18 months later, on June 19, 2003, Touch America, its wholly-owned subsidiary, Entech, LLC, and their affiliates commenced chapter 11 reorganization cases before this Court.

On June 15, 2005, the Plan Trustee filed a First Amended Complaint (docket no. 2)(the "Trustee's Complaint") against fourteen defendants in adversary proceeding no. 04-54840.[6]   The

---

[4]*See* Statement of Material Facts As To Which There Exist No Genuine Issue To Be Tried (docket no. 37)(the "Statement") filed by the Plan Trustee in connection with his Summary Judgment Motion. While the McGreevey Shareholders (as defined herein) have not adopted those facts expressly, the arguments raised in the motions filed by each party show that the material background facts are not dispute. More details about the entities and transactions described briefly in this section are provided in the Undisputed Facts section of this Memorandum, which is also taken largely from the Statement.

[5]The case is pending as docket no. 03-cv-01-SEH in the United States District Court for the District of Montana, Butte Division.

[6]Unless otherwise expressly stated, the docket numbers referenced herein relate to the docket for adversary proceeding 08-51415. The entries on the docket for adversary no. 08-51415 cite back to the docket for adversary number 04-54840, in which the relevant pleadings were originally filed.

3

Trustee's Complaint contains eight claims for relief. The first seven claims seek damages for breach of fiduciary duties and the return of payments pursuant to 11 U.S.C. §547 from former officers and directors of Touch America, Entech, and/or Montana Power Company (the "Insider Defendants").[7] The eighth claim seeks an injunction preventing the plaintiffs in the McGreevey Litigation (i.e., the McGreevey Shareholders) from pursuing a claim in the McGreevey Litigation for loss of stock value.[8] The eighth claim (the "Injunction Claim") became a center point for a spate of dispositive motions in adversary proceeding 04-54840.

The McGreevey Shareholders filed a motion to dismiss the Trustee's Complaint (the "Shareholders' Motion to Dismiss")(docket no. 20) arguing, among other things, that the Plan Trustee lacks standing to pursue claims against the Insider Defendants because Touch America is not the successor-in-interest to Montana Power. The Trustee objected to the Shareholders' Motion to Dismiss, arguing (among other things) that the Trustee has standing to seek the injunction as the successor holding company to Montana Power and, further, that the McGreevey O&D Claim is a derivative claim that cannot be brought by the McGreevey Shareholders. The

---

[7]The "Insider Defendants" consist of Robert P. Gannon, Jerrold Pederson, Michael Zimmerman, Carl Lehkind III, Alan F. Cain, and John R. Jester.

[8]The Fourth Amended Complaint filed in the McGreevey Litigation (the "McGreevey Complaint") contained five claims. In the eighth count of the Trustee's Complaint, the Plan Trustee seeks to prevent the McGreevey Shareholders from pursuing the third claim in the McGreevey Complaint, which seeks damages for the significant loss of stock value in the approximate sum of $3 billion dollars from individual defendants based upon (a) the Montana Power officers' and directors' breach of fiduciary duties of care, candor, and loyalty to the Shareholders by engaging in an intentional course of conduct to deprive shareholders of their voting and dissenter rights, and (b) the officers' and directors' breach of fiduciary duty of loyalty owing to shareholders by structuring and implementing a divestiture scheme for their own financial interests. In his Reply Brief in support of the Trustee's Summary Judgment Motion, the Plan Trustee states that he seeks to enjoin *two* of the five claims in the McGreevey Complaint (which the Plan Trustee defines as the "Corporate Injury Claims"). However, the Plan Trustee did not amend his Complaint. Thus, I will consider only whether the McGreevey Shareholders should be enjoined from pursuing the third claim in the McGreevey Complaint (the "McGreevey O&D Claim").

4

McGreevey Shareholders also filed a Motion to Certify Issues to the Montana Supreme Court (the "Motion to Certify Issues")(docket no. 22), to which the Trustee objected.

The Trustee later filed a motion for summary judgment (the "Trustee's Summary Judgment Motion")(docket no. 35) asking the Court to declare that the claims against the Individual Defendants are property of the Debtors' bankruptcy estates and to permanently enjoin the McGreevey Shareholders from pursuing the McGreevey O&D Claim against the Individual Defendants in the Montana District Court. In support of the Trustee's Summary Judgment Motion, the Trustee filed a Statement of Undisputed Facts ("Statement")(docket no. 37) and a Request for Judicial Notice in Support of Motion of Plan Trustee ("RJN")(docket no. 38). Oral argument was held on March 28, 2007 regarding the Shareholders' Motion to Dismiss, the Motion to Certify Issues, and the Trustee's Summary Judgment Motion.[9]

At a status conference held on September 5, 2007, counsel for the Trustee and counsel for the McGreevey Shareholders reported that they had reached a settlement in principle regarding the Injunction Claim. At the parties' request, the Court entered an order on September 17, 2007 staying any further action on the Dispositive Motions under advisement.

At a hearing in the Montana District Court on January 11, 2008, the Montana District Court denied the parties' motion for approval of the proposed settlement agreement and, for the reasons stated on the record in that proceeding, entered an order prohibiting counsel for the McGreevey Shareholders from further representation of the McGreevey Shareholders in the

---

[9]The Shareholders' Motion to Dismiss, the Motion to Certify Issues and the Trustee's Summary Judgment Motion shall be jointly referred to herein as the "Dispositive Motions."

Montana District Court or in the bankruptcy court.[10]   (Tr. of status hearing at 80-81, *McGreevey v. Montana Power Co.*, No. 03-01-BU-SEH (D.Mt. Jan. 11, 2008), attached as Ex. A to docket no. 64 in this adversary proceeding).  Counsel for the McGreevey Shareholders have appealed the injunction, which is presently pending before the United States Court of Appeals for the Ninth Circuit.

On January 30, 2008, the Plan Trustee filed a motion to sever the Injunction Claim from the other seven claims in adversary proceeding 04-54840.  By Order dated August 26, 2008, the Plan Trustee's motion to sever was granted so that the Trustee could continue to press its claims against the Insider Defendants in adversary proceeding 04-54840, while the Injunction Claim against the McGreevey Shareholders could be considered in this separate adversary proceeding.

The main issue of contention between the McGreevey Shareholders and the Trustee is which entity - - the corporation or the shareholders - - can assert claims against the Insider Defendants.  In order to resolve that dispute, I first must determine (i) whether the McGreevey O&D Claim is a direct claim that may be pursued by individual shareholders or whether it is derivative and must be pursued on behalf of the corporation; and (ii) if the claim is derivative, whether Touch America is the proper entity to pursue it. For the reasons set forth below, I conclude that the claim is derivative, but that there are still issues of material fact regarding whether Touch America is the successor-in-interest to Montana Power with the right to pursue the derivative claims.  Accordingly,  the Trustee's Motion for Summary Judgment will be granted, in part, with respect to the issue of the whether the claim is derivative, and will be

---

[10]There has been no substitution of counsel in this Court for the McGreevey Shareholders, but the matters *sub judice* were fully briefed before issuance of the Montana District Court's injunction.

denied, in part, with respect to his request for a permanent injunction, because issues of material fact remain regarding the successor-in-interest issue.  Further, for the reasons set forth below, the McGreevey Shareholders' Motion to Dismiss and Motion to Certify Issues will be denied.

UNDISPUTED FACTS[11]

As of December 1997, Montana Power directly owned assets and operations related to two types of businesses: (i) an energy generation business; and (ii) an energy utility (transmission and distribution) business.  In addition, Montana Power was a holding company whose subsidiaries included the following:  (i) Touch America, Inc., a telecommunications business, and (ii) Entech, Inc. ("Entech"), a subsidiary holding company which, in turn, owned a variety of oil and gas assets and subsidiaries, a variety of coal mining assets and subsidiaries, and an independent power business known as Continental Energy Services, Inc.

The Generation Assets Sale.

On December 9, 1997, the MP Board voted to sell its assets related to electrical generation (the "Generation Assets Sale").  The MP Board and certain senior officers of Montana Power received a memorandum from Pam Merrell[12] advising them that the Generation Assets Sale did not require the approval of shareholders under applicable Montana state law.  On December 17, 1999, the Generation Assets Sale closed pursuant to the terms of an Asset Purchase Agreement, by which Montana Power received $757.6 million in cash proceeds and cash equivalents from the buyer, PPL Montana, LLC ("PPL").

---

[11] See n. 4, supra.

[12] Although the Statement, briefs, declarations, and exhibits do not specifically identify her title, presumably, Pam Merrell was a member of Montana Power's in-house legal department.

7

The Energy Divestiture.

On March 28, 2000, the MP Board approved the Divestiture, designed to focus Montana Power's entire business on telecommunications operations by selling its remaining energy-related assets, which, by that time, were comprised of (i) the utility business directly owned by Montana Power, (ii) a group of coal businesses owned by Entech, (iii) a group of oil and gas businesses owned by Entech, and (iv) an independent power business (Continental Energy Services, Inc.) owned by Entech. Prior to approving the Divestiture, the MP Board received an internal memorandum from Pam Merrell advising that the Divestiture would constitute a sale of substantially all of Montana Power's assets pursuant to MCA §35-1-823, and would require approval of its shareholders.[13] However, the MP Board did not seek shareholder approval at that time and proceeded with the following sales:

(1)     a sale to PanCanadian Petroleum Limited of outstanding capital stock and assets of Entech's subsidiaries that owned oil and gas businesses, which sale was approved by the MP Board on August 22, 2000 and closed on October 31, 2000;

(2)     a sale to Westmoreland Coal Company of all outstanding capital stock of Entech's subsidiaries that owned coal businesses, which sale was approved by the MP Board on September 14, 2000 and closed on April 30, 2001; and

(3)     a sale to BBI Power Corporation for the outstanding capital stock of Entech's subsidiary, Continental Energy Services, inc., which sale was approved by the executive committee of the MP Board on September 19, 2000 and closed on February 21, 2001.

---

[13]*See* n. 12, *supra.*

8

On September 29, 2000, the MP Board approved the sale of its directly owned electrical transmission and distribution assets (the "Utility Assets") to NorthWestern Corporation ("NorthWestern") for $602 million in cash and the assumption of up to $448 million of debt (the "Utility Sale").[14] To effect this sale, NorthWestern entered into a Unit Purchase Agreement with both Touch America and Montana Power dated as of September 29, 2000 (the "UPA"). Under the UPA, and subject to certain conditions precedent including regulatory approval, NorthWestern agreed to purchase outstanding membership interests in a limited liability company known as Montana Power LLC ("MPLLC"), following a proposed merger that would place Montana Power's utility assets with MPLLC.

The Restructuring.

To facilitate the Divestiture of Montana Power's and Entech's energy assets, Montana Power carried out a corporate restructuring that included:

(1)    creation of a new subsidiary, Touch America, which would become the new holding company of the restructured enterprise;

(2)    creation of a new subsidiary, MPLLC, to serve as a vehicle for the sale of the Utility Assets to NorthWestern and into which Montana Power would be merged; and

(3)    the creation of a new subsidiary, Entech LLC, to facilitate the transfer of ownership of remaining assets to Touch America as the new holding company and into which Entech would be merged.

On September 27, 2000, Montana Power caused Touch America to be incorporated in the State of Delaware as a wholly owned subsidiary of Montana Power. The rationale for establishing Touch America as a new Delaware holding company in place of Montana Power

---

[14]NorthWestern filed its own chapter 11 bankruptcy proceeding before this Court on September 14, 2003 (case no. 03-12872).

was that such action would allow the enterprise to divest its energy assets with better tax treatment and fewer regulatory hurdles.

On September 21, 2001, a supermajority of Montana Power shareholders approved the Restructuring and the Utility Sale.[15]

On February 13, 2002, the following events related to the Restructuring occurred: (i) Montana Power became a subsidiary of Touch America, (ii) all former shareholders of Montana Power were issued replacement stock in Touch America, (iii) upon completion of the exchange of the replacement stock in Touch America, Montana Power was merged into MPLLC, with the latter being the surviving entity, (iv) Entech was merged into Entech, LLC, with the latter being the surviving entity, and (v) MPLLC upstreamed its membership interest in Entech, LLC to Touch America.

The Utility Sale.

On February 13, 2002, the Touch America Board of Directors (the "Touch America Board") passed a series of resolutions to complete preparations for the Utility Sale. On or about February 15, 2002, the transactions under the UPA were finalized through the sale of the unit interests in MPLLC to NorthWestern.

After closing of the Utility Sale, MPLLC's name was changed to NorthWestern Energy

---

[15]In the summer of 2001, as Montana Power solicited its shareholders' approval of the Restructuring, certain shareholders dissented from the sale pursuant to Montana Code sections 35-1-826 and 35-1-836 and asked that their shares be repurchased at fair value. The MP Board subsequently determined that the fair value of the stock was $5.53 per share. (Ex. C to the Request for Judicial Notice ("RFJN"))(docket no. 38). Some shareholders responded to the offer by redeeming their shares for the "fair value" set by Montana Power. Other shareholders filed objections to the proposed valuation and demanded a value of $30.00 per share or more. In response to these demands, Touch America initiated a declaratory relief action in Montana state court on April 24, 2002, asking the court to determine the true fair value of stock redeemed by dissenting shareholders, styled *TouchAmerica Holdings, Inc. v. Lotti,* case no. DV-02-96 in the Montana Second Judicial District Court, Silver Bow County (the "Lotti Litigation").

LLC. Thereafter, in November 2002, NorthWestern Energy LLC changed its name to Clark

Fork and Blackfoot, LLC.

DISCUSSION

1.    Post-confirmation Jurisdiction.

In their Motion to Dismiss, the McGreevey Shareholders argue that this Court does not

have jurisdiction to decide the Injunction Claim.[16]  Essentially, they argue that (i) the central

issues before the Court (i.e. whether certain claims asserted in the McGreevey Litigation are

direct or derivative claims, and whether the Debtor has any right to pursue certain claims as a

successor-in-interest to Montana Power) are state law issues that should be decided by the

Montana District Court in the McGreevey Litigation; and (ii) there is no longer a bankruptcy

estate that will be affected by the outcome of this proceeding, since the Debtor's confirmed plan

transferred all assets out of the bankruptcy estate to the Plan Trust.

In response, the Trustee argues that the confirmed Plan expressly provided for this Court

to retain a broad scope of jurisdiction to hear matters post-confirmation.[17]  However, plan

---

[16]In the alternative, the McGreevey Shareholders also argue that this Court should abstain from considering the Injunction Claim because the matter is already the subject of the lawsuit before the Montana District Court. The Trustee argues that the McGreevey Shareholders' abstention argument is not properly before this Court because it should be raised in a separate motion, not as part of motion to dismiss. *(See Bohm v. The Horsley Co. (In re Groggel)*, 305 B.R. 234, 237 (Bankr.W.D.Pa. 2004) and Fed.R.Bankr.P. 5011(b)). The six requirements for mandatory abstention are (1) a timely motion is made; (2) the proceeding is based upon a state law claim or state law cause of action; (3) the proceeding is related to a case under title 11; (4) the proceeding does not arise under title 11; (5) the action could not have been commenced in a federal court absent jurisdiction under 28 U.S.C. §1334; and (6) an action is commenced, and can be timely adjudicated in a state forum of appropriate jurisdiction. *Koken v. Reliance Group Holdings, Inc. (In re Reliance Group Holdings, Inc.)*, 273 B.R. 374, 391 (Bankr. E.D.Pa. 2002). Because the McGreevey Shareholders have not filed an abstention motion and because I have decided that this proceeding raises core bankruptcy issues, neither mandatory nor permissive abstention under 28 U.S.C. §1334(c)(2) is appropriate.

[17]In support, the Trustee notes that Article X of the Plan provides, in relevant part, that "the Bankruptcy Court shall retain jurisdiction of all matters arising in, arising under, and related to the

11

provisions cannot confer jurisdiction upon the bankruptcy court. *In re Resorts Int'l, Inc.*, 372 F.3d 154, 161 (3d Cir. 2004). In *Resorts*, the Court of Appeals for the Third Circuit decided that "[r]etention of jurisdiction provisions will be given effect, assuming there is bankruptcy court jurisdiction. But neither the bankruptcy court nor the parties can write their own jurisdictional ticket. Subject matter jurisdiction 'cannot be conferred by consent.' . . . [I]f a court lacks jurisdiction over a dispute, it cannot create that jurisdiction by simply stating that it has jurisdiction in a confirmation or other order." *Resorts*, 372 F.3d at 161 (citations omitted).

Subject matter jurisdiction over bankruptcy cases and proceedings originates in 28 U.S.C. §1334, which grants district courts "original and exclusive jurisdiction of all cases under title 11" and "original and not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. §1334(a) and §1334(b). The district courts are authorized to refer bankruptcy cases and proceedings to the bankruptcy judges for their district. 28 U.S.C. §157(a). The United States District Court for the District of Delaware has effected such a referral. Bankruptcy Court jurisdiction, therefore, extends potentially to four categories of title 11 matters:

---

Chapter 11 Cases and the Plan, for the purposes of section 105(a) and 1142 of the Bankruptcy Code, and for among other things, the following purposes;

....

(d)     to hear and determine any and all adversary proceedings, applications, or contested matters, including any remands from appeals;

....

(i)     to enable the Plan Trust to prosecute any and all proceedings which may be brought to set aside Liens or encumbrances and to recover any transfers, assets, properties or damages to which the Post-Confirmation Debtors and the Plan Trust may be entitled under applicable provisions of the Plan, the Bankruptcy Code or any federal, state or local laws, including Causes of Action, controversies, disputes and conflicts between the Debtors and any other party, including but not limited to, any Avoidance Actions, objections to Claims, motions for subordination on any grounds and claims preserved under the Plan and pursuant to the Confirmation Order; ....

(1)    cases under title 11;

(2)    proceedings under title 11;

(3)    proceedings arising in a case under title 11; and

(4)    proceedings related to a case under title 11.

*Resorts,* 372 F.3d at 162. The first three categories of title 11 matters are known as "core" bankruptcy matters. *Id.* The fourth category of title 11 matters is known as "non-core" bankruptcy matters.[18] *Id.*

The motions before me require a determination of whether certain claims against the Insider Defendants belong to Touch America. At bottom, therefore, the issues raised by the Motion to Dismiss and the Summary Judgment Motion prompt the question of whether the claims against the Insider Defendants are property of the Debtor's estate that were transferred to the Trustee upon Plan confirmation. Various courts have concluded that matters requiring a declaration of whether certain property comes within the definition of "property of the estate" as set forth in Bankruptcy Code § 541 are core proceedings. *Schroeder v. New Century Holdings, Inc. (In re New Century Holdings, Inc.),* 387 B.R. 95, 105 (Bankr.D.Del. 2008) citing *Pension Benefit Guaranty Corp. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.),* 138 B.R. 442, 445 (D.Del. 1992) (A determination regarding property of the estate is a core proceeding); *All American Laundry Service v. Ascher (In re Ascher),* 128 B.R. 639, 643 (Bankr.N.D.Ill. 1991) (When a debtor and its creditors claim interests in property asserted to be part of the estate, the

---

[18]The practical consequence of the distinction between core and non-core bankruptcy matters is this: in core matters, bankruptcy courts may render final decisions, subject to appellate review (28 U.S.C. §157(b)(1), §158(a)); in non-core matters, bankruptcy courts make only proposed findings of fact and conclusions of law for *de novo* review and consideration by the district court (28 U.S.C. §157(c)(1)). *Reliance Group Holdings,* 273 B.R. at 392.

bankruptcy court has core jurisdiction to adjudicate all of those interests); *Knopfler v. Schraiber (In re Schraiber)*, 97 B.R. 937, 939-40 (Bankr.N.D. Ill. 1989) (Bankruptcy court has core jurisdiction to determine what is estate property and can apply state law or any other relevant authority in making such a determination.) *See also Reliance Group Holdings*, 273 B.R. at 394-95 (A proceeding to determine whether certain property rights are "property of the estate" under Bankruptcy Code §541 is a core proceeding, even if the determination rests upon interpretation of state law.) The issues currently before me are core issues.[19]

The McGreevey Shareholders also argue that Plan confirmation ended the Bankruptcy Court's jurisdiction. The Court of Appeals for the Third Circuit has considered the issue of post-confirmation "related to" bankruptcy jurisdiction in the *Resorts* decision. "The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect of the estate being administered in bankruptcy...." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984).[20] After plan confirmation, related-to bankruptcy court jurisdiction is limited because all property of the estate usually vests in the reorganized debtor (unless the plan provides otherwise). However, the *Resorts* Court decided that post-confirmation bankruptcy court related-to jurisdiction is "normally appropriate" for matters in which "there is a close nexus to the

---

[19]Core proceedings represent a subset of "related to" proceedings. *Adams v. Prudential Securities, Inc. (In re Foundation for New Era Philanthropy)*, 201 B.R. 382, 387-88 (Bankr.E.D.Pa. 1996). *See also In re Central Ice Cream Co.*, 82 B.R. 933, 936 (N.D.Ill. 1987)("a proceeding that is not a related proceeding *a fortiori* cannot be a core proceeding");

[20]While *Pacor* was overruled on other grounds by *Things Remembered, Inc. v. Petrar*, 516 U.S. 124, 134-35 (1995)(Stevens, J. concurring), the *Pacor* test for "related to" jurisdiction was discussed favorably by the U.S. Supreme Court in *Celotex Corp. v. Edwards*, 514 U.S. 300, 308, 115 S.Ct. 1493, 1499, 131 L.Ed.2d 403 (1995), and in footnote 6 of *Celotex*, the Supreme Court noted that - - as of that time - - eight other circuit courts had adopted the *Pacor* test with little or no variation. There has since been no material change among the circuits in that trend.

14

bankruptcy plan or a proceeding, as when a matter affects the interpretation, implementation,

consummation, execution, or administration of a confirmed plan or incorporated litigation trust

agreement." *Resorts*, 372 F.3d at 168-69.

Because I have determined that the issues before me are core bankruptcy issues, I am not

required to address the "close nexus" test. *Geruschat v. Ernst Young LLP (In re Seven Fields*

*Dev. Corp.)*, 505 F.3d 237, 260 (3d Cir. 2007). As the Court explained in *Seven Fields*:

> [T]he "close nexus" standard only applies for the purposes of determining
> whether a federal court has jurisdiction over a non-core "related to" proceeding in
> the post-confirmation context. *See Resorts*, 372 F.3d at 164-67. Appellants seem
> to believe that any time a party files a case post-confirmation, the "close nexus"
> test is triggered. This is plainly not the case. While courts may choose to rely on
> "related to" jurisdiction because it is the broadest category of federal bankruptcy
> jurisdiction when examining their own jurisdiction, it certainly is not incumbent
> upon them to do so, because, as occurred here, a party may argue and a court may
> decide that a proceeding falls within one of the narrower categories of
> jurisdiction, such as "arising in"jurisdiction, in which case the "related to"
> jurisdiction and the corresponding "close nexus" test are not implicated.

*Seven Fields,* 505 F.3d at 260. I conclude that I have jurisdiction to determine the core issues

raised in the Dispositive Motions.

2.      Whether certain issues should be certified to the Montana Supreme Court?

The McGreevey Shareholders have asked that the following five issues be certified to the

Montana Supreme Court for resolution:

(1)     Did all rights, duties, assets and liabilities of Montana Power, arising or existing
        under state law, transfer to and vest in MPLLC by operation of the February 15,
        2002 merger?

(2)     Under Montana law, does Touch America have any standing to assert, as
        successor to Montana Power, claims arising out of the conduct of the officers and
        directors of Montana Power for events and occurrences prior to the February 15,
        2002 merger?

(3)     Under Montana law, do the officers and directors of a wholly owned subsidiary owe their duties, including the duties of care, candor and loyalty, exclusively to the then-existing parent corporation or its shareholders?

(4)     Does Entech LLC, the successor to Entech, Inc., have standing to assert any claim against officers and directors of Entech, Inc. for such officers' and directors' action taken at the behest of its parent company (Montana Power) prior to February 15, 2002?

(5)     Under Montana law, is a claim by shareholders for breach of duties to provide a shareholder vote and dissenter rights under §35-1-823, MCA, a direct claim belonging to the shareholders or a derivative claim on behalf of the corporation?

The McGreevey Shareholders make this request pursuant to Rule 44 of the Montana

Rules of Appellate Procedure, which provides, in pertinent part:

(c)     **Power to answer**.  The supreme court of this State may answer a question of law certified to it by a court of the United States or by the highest court of another State ..., if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State.

Mt.R.App.P  44 (2007).[21]

Issues of state law should not be routinely certified to state courts simply because a

certification procedure is available.  *Dorman v. Satti*, 862 F.2d 432, 435 (2d Cir. 1988).  In

---

[21] Whether a bankruptcy court falls within the phrase "court of the United States" as used in the foregoing rule is an open issue.  Under federal law, "court of the United States" is a defined term and does not expressly include bankruptcy courts, which, by virtue of 28 U.S.C. §151 are units of the district court. Depending on the statute being analyzed, courts have taken different views on whether a bankruptcy court falls within the definition of "court of the United States."  *Compare Deville v. Cardinale*, 280 B.R. 483, 494 (9th Cir. BAP 2002) (recognizing that the Ninth Circuit does not regard a bankruptcy court as a "court of the United States" for purposes of 28 U.S.C. §1927) *with In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 103-04 (3d Cir. 2008)(deciding that a bankruptcy court is a unit of the district court and, thus, comes within the scope of a "court of the United States" for purposes of 28 U.S.C. §451); and *Robinson v. Champaign Landmark, Inc. (In re Robinson)*, 326 F.3d 767, 771 (6th Cir. 2003) (recognizing that a bankruptcy court is a "court of the United States" for purposes of the Federal Arbitration Act).  The record before me does not reveal what this phrase is intended to mean in Montana Rule of Appellate Procedure 44.  This issue need not be resolved, however, because the motion will be denied for other reasons.

deciding whether to certify issues to a state court, a court may consider "the closeness of the question and the existence of sufficient sources of state law - - statutes, judicial decisions, attorney general's opinions - - to allow a principled rather than conjectural conclusion." Wright & Miller, 17A Fed.Prac.&Proc. Juris. 3d §4248 (2007). As set forth in the discussions below, there is sufficient statutory and decisional law available to determine capably how the issues would be resolved by a Montana court, with the exception of the third issue put forth by the McGreevey Shareholders.[22]

The parties did not cite to, and I did not locate, any Montana statute or decisional law applicable to the third issue. However, the limited decisional law on this issue (discussed in section 4 of this Memorandum, *infra.*) includes decisions from Delaware and the Bankruptcy Court for the Northern District of Texas, and provides sufficient guidance, along with other considerations, without resort to the Montana Supreme Court. Rather than expending still more time and judicial resources involved in certifying the issue to the Montana Supreme Court, I will analyze the issues here. The Motion to Certify Issues will be denied.

3.    Whether the McGreevey O&D Claim is a direct claim or a derivative claim?

In the Trustee's Complaint, the Trustee asks this Court to enjoin the McGreevey Shareholders from pursuing Count 3 of the McGreevey Complaint, which asserts a claim against the Montana Power officers and directors for their breach of fiduciary duties, resulting in a loss

---

[22]In some respect, the fourth issue drafted by the McGreevey Shareholders is indistinguishable from the third issue. For the reasons discussed below, Entech LLC, as the surviving entity of the merger between Entech and Entech LLC, became the owner of any right held by Entech to assert claims its officers and directors. However, because Entech was a wholly-owned subsidiary of Montana Power, the fourth issue also poses the question of whether the officers and directors of a wholly-owned subsidiary owe a duty to the subsidiary or to the parent company and its shareholders. The reasoning for denying certification of the third issue applies equally to the fourth issue.

17

of stock value (the "McGreevey O&D Claim").[23]  The main issue raised in the Trustee's

Summary Judgment Motion is whether the McGreevey O&D Claim is a derivative cause of

action (i.e., a claim alleging injury to the corporation) or a direct, individual cause of action (i.e.,

a claim alleging injury to the shareholder).  *See* 12B Fletcher Cyc. Corp. §5911 (2006).

The McGreevey Shareholders argue that the Montana District Court, in its order dated

August 1, 2002, already decided that claims in the McGreevey Complaint, including the

McGreevey O&D Claim, were direct claims.[24]  The August 1, 2002 Order denied separate

motions, filed by various defendants, to dismiss the McGreevey Complaint.  In the Conclusions

of Law, the Court wrote:

> A duty is created, and a right enforceable by, the shareholders of the corporation through
> [Mt. Stat.] 35-1-823.  A claim based on this statute is a direct claim and is not derivative
> of the corporation's rights.

*McGreevey v. Montana Power Co.*, No. DV-01-141 (D. Mont. filed Aug. 1, 2002).  The August

1, 2002 Order denied the motions to dismiss on the grounds that, among other things, the claims

were direct in nature.  The August 1, 2002 Order, however, did not address each claim

individually, but only made a broad statement about claims brought under Mt. Stat. 35-1-823,

which provides shareholders with the right to vote on certain transactions (the "Voting Rights

Statute").  However, for reasons set forth herein, I conclude that the McGreevey O&D Claim,

although characterized by the McGreevey Shareholders as a claim to vindicate voting and

dissenters' rights, does not seek damages related to the Voting Rights Statute.  Therefore, the

specific issue before me - - whether the McGreevey O&D Claim, in particular, is a direct or

---

[23]*See* n. 8 *supra.*

[24]The order was entered by the Honorable Thomas J. McKittrick of the Montana Second Judicial
District Court, Silver Bow County.

18

derivative claim - - was not disposed of in the August 1, 2002 Order and, therefore, will be

considered here.[25]

When analyzing whether a complaint states a direct or derivative claim, the Ninth Circuit

Court of Appeals, considering a case under Montana law, decided:

> As a general rule, an action enforces a corporate right "if the gravamen of the
> complaint is injury to the corporation, or to the whole body of its stock or
> property without any severance or distribution among individual holders."
> Therefore, if the corporate wrong decreases the value of the corporation's stock, it
> does not necessarily create a direct cause of action for shareholders....A direct
> action can be brought either when there is a special duty, such as a contractual
> duty, between the wrongdoer and the shareholder, or when the shareholder suffers
> injury separate and distinct from that suffered by other shareholders.

---

[25]Moreover, I reject the McGreevey Shareholders' argument that collateral estoppel applies to the
direct/derivative issue, because the August 1, 2002 Order was not a final, appealable order. Collateral
estoppel bars litigants from re-litigating an issue that was essential to a prior judgment and will apply if
the following four-part test is met: (i) the identical issue raised was previously decided in a prior
adjudication; (ii) a final judgment on the merits was issued in the prior adjudication; (iii) the party against
whom collateral estoppel is now asserted was a party or in privity with a party to the prior adjudication;
and (iv) the party against whom preclusion is asserted must have been afforded a full and fair opportunity
to litigate any issues which may be barred. *Baltrusch v. Baltrusch*, 331 Mont. 281, 290, 130 P.3d 1267,
1274 (2006). The Trustee argues that the August 1, 2002 Order denying the various motions to dismiss
was not a final order. In *Baltrusch*, the Court noted that "[i]t is widely recognized that the finality
requirement is less stringent for issue preclusion than for claim preclusion." *Baltrusch*, 130 P.3d at 1274
*quoting Christo v. Padgett*, 223 F.3d 1324, 1339 (11th Cir. 2000). In *Baltrusch*, the Court held that the
judgment and order entered by a district court were final, despite the pendency of post-trial motions,
because the district court judgment was entered after a full trial on the merits and contained thirty-two
factual findings, sixteen conclusions of law, and enumerated fifteen distinct orders. *Baltrusch*, 130 P.3d
at 1276. In the *Christo* case, the Court had decided that "preliminary findings" in an order approving a
settlement agreement, made after a full evidentiary hearing and followed by a final order three weeks
later, was final for purposes of issue preclusion. *Christo*, 223 F.3d at 1339-40.

   The August 1, 2002 Order was entered upon consideration of motions to dismiss claims under
Fed.R.Civ.P. 12(b)(6). When considering a motion to dismiss, a court will assume all factual allegations
in the complaint are true and will construe them in the light most favorable to non-moving party. *Knievel
v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). *See also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,
127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) *quoting Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct.
2932, 92 L.Ed.2d 209 (1986)(Courts "are not bound to accept as true a legal conclusion couched as a
factual allegation.") The August 1, 2002 Order did not set forth specific factual findings and also does
not set forth detailed conclusions of law specific to each claim. Collateral estoppel, therefore, does not
bar consideration of the issue of whether the McGreevey O&D Claim is a direct or derivative claim.

*Sax v. World Wide Press, Inc.*, 809 F.2d 610, 613-14 (9th Cir. 1987)(citations omitted).[26] The *Sax* cause of action arose when the defendant officers and directors allegedly breached an employment agreement with the plaintiff by refusing to allow the plaintiff to exercise an option to buy additional company stock and, after he resigned, conspiring to deplete the company's assets and depreciate the value of his stock. *Sax*, 809 F.2d at 612. In *Sax*, the plaintiff argued that his claim was a direct cause of action because of the special duty between himself and the defendants based upon his employment contract. *Sax*, 809 F.2d at 614.   The *Sax* Court disagreed and decided that the damages sought by the plaintiff for losses on his stock investment were injuries to the company, and not to the plaintiff personally. *Sax*, 809 F.2d at 614. Although some of the acts complained of were related to the plaintiff's employment agreement, the damages sought were based on the unmarketability of his stock caused by the defendants' actions of corporate mismanagement and diversion of corporate assets. *Id.* This injury was suffered by all of the company's shareholders, not by the plaintiff alone. *Id.* Because the injury was incidental to injuries to the company, the cause of action was derivative. *Id.*

The McGreevey Shareholders argue that the McGreevey O&D Claim is a direct cause of action because it includes claims for the breach of special duties owed to the McGreevey

---

[26]Whether an action is characterized as direct or derivative is a question of state law. *World Wide Press*, 809 F.2d at 613. The McGreevey Shareholders contend that the law of Montana is controlling on this issue. The Trustee argues that the result is the same regardless of whether the issue is analyzed under Montana or Delaware law and I agree. In *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. Supr. 2004), the Supreme Court of Delaware narrowed the test for determining whether an action was direct or derivative, concluding that the analysis must be based solely on the questions of (i) who suffered the alleged harm - - the corporation or the suing stockholder individually - - and (ii) who would receive the benefit of the recovery or other analysis? *Tooley*, 845 A.2d at 1035. The *Tooley* Court disapproved of an analysis that considered whether the shareholder suffered a "special injury" that was unlike any injury suffered by other shareholders. *Id.* The alleged harm here - - loss of stock value - - is suffered by the corporation, and any recovery of that value should be for the benefit of the corporation. The result is the same regardless of whether Montana law or the narrower Delaware test is applied.

Shareholders (i.e., voting and dissenters' rights), which arise under statute and contract.[27] However, like the plaintiff in *Sax*, the damages sought here (i.e., the loss of stock value) are not incidental to the violation of their voting and dissenters' rights, but arise from the allegedly improper Divestiture and Restructuring. The loss to Montana Power's stock value is an injury to the corporation that harmed all Montana Power shareholders. As in *Sax*, the McGreevey O&D Claim is derivative.

The McGreevey Shareholders argue that their claims are similar to the shareholder claims for violation of dissenters' rights statutes that were recognized by the Supreme Court of Montana in *Hansen v. 75 Ranch Co.*, 288 Mont. 310, 957 P.2d 32 (Mt. 1998). In *Hansen*, the Supreme Court of Montana noted that the "remedy provided by dissenters' rights statutes enables shareholders who object to extraordinary corporate transactions to dissent from the corporate action and to require the corporation to buy their shares at fair value." *Hansen*, 957 P.2d at 37. The *Hansen* Court held that a shareholder could not be deprived of his or her dissenters' rights, even if the action was taken without presenting it to the shareholders for a vote. *Hansen*, 957 P.2d at 39. In the McGreevey Litigation, the McGreevey Shareholders are not seeking to enforce "dissenters' rights" and recover the fair value of their shares, determined "immediately

---

[27]The Montana Business Corporation Act, Mt. St. 35-1-112 *et seq.*, recognizes that shareholders must vote to approve a sale of all or substantially all of the corporation's property other than in the usual and regular course of business. Mt. St. 35-1-823 (1). The Act further provides that a shareholder may dissent from such a sale and receive payment of the fair value of the shareholder's shares if that sale is consummated. Mt. St. 35-1-827(1)(c). The fair value of the shares is determined as of the time "immediately before the effectuation of the corporate action to which the dissenter objects." Mt. St. 35-1-826(4). Shareholders are entitled to notice of any proposed corporate action that creates dissenters' rights. Mt. St. 35-1-829.

The McGreevey Shareholders also assert that their voting rights arise by contract because Section 19C of the Montana Power bylaws required shareholder approval of a sale of all or substantially all of Montana Power's assets.

before the effectuation of the corporate action to which the dissenter objects." Mt. Stat. 35-1-826 (4). Other Montana Power shareholders asserted claims to exercise their dissenters' rights in the Lotti Litigation (*see* n. 15), but the McGreevey Shareholders did not.

The McGreevey Shareholders also rely on *Hansen* as support for their ability to assert a separate claim against individual defendants for violating dissenters' rights statutes. The *Hansen* Court, however, did not reach that issue, writing: "[b]ecause we determine that the Minority Shareholders are entitled to 'fair value' pursuant to the dissenters' rights statute, we do not reach the issue of whether the Majority Shareholder acted in an oppressive manner that breached fiduciary duties which could entitle the Minority Shareholders to fair value pursuant to [Mt. Stat.] §§ 35-9-501 and -503." *Hansen* does not stand for the proposition asserted by the McGreevey Shareholders.

The McGreevey O&D Claim, therefore, is not like the claims asserted in *Hansen*, but is like the claims asserted in *Geer v. Cox*, 242 F.Supp.2d 1009 (D.Kan. 2003). In *Geer*, a shareholder of TransFinancial Holdings, Inc. ("TransFinancial") brought a direct claim against TransFinancial and its officers and directors for damages suffered when the corporation sold a subsidiary without obtaining shareholder approval as required by §271 of the Delaware Corporation Code.[28] The *Geer* Court wrote:

---

[28]TransFinancial was a Delaware corporation headquartered in Lenexa, Kansas. The plaintiff-shareholder alleged actions in violation of Delaware law and the case was decided under Delaware law, apparently without dispute.

Section 271(a) of the Delaware Corporation Code provides:

(a)    Every corporation may at any meeting of its board of directors or governing body sell, lease or exchange all or substantially all of its property and assets, including its goodwill and its corporate franchises, upon such terms and conditions and for such consideration, which may consist in whole or in part of money or other property, including shares of stock in, and/or other securities of, any other corporation or corporations, as its board of directors or governing body deems expedient and for the best interests of the corporation,

Although plaintiff characterizes the action as a deprivation of the individual shareholders' voting rights, in essence, plaintiff's claim is that the Individual Defendants breached their fiduciary duty and did not act in the best interest of the corporation when they sold the assets without shareholder approval. The gravamen of the plaintiff's complaint is injury to the corporation, seeking an accounting of the sale of corporate property and money damages, which must be asserted derivatively. Although the plaintiff's claim might have been properly brought as a direct action to enjoin the pending sale of the [subsidiary], it cannot now be maintained as a direct action once the sale of assets has been consummated.

*Geer*, 242 F.Supp.2d at 1018.[29]

The nature of the wrong alleged in the McGreevey O&D Claim involves the breach of an officer's duty to present the sale of assets to shareholders for approval. However, the gravaman of the complaint and the injury claimed - - loss of stock value - - is clearly an injury to the corporation. The McGreevey Shareholders have not shown that the injury alleged in the

_____

when and as authorized by a resolution adopted by the holders of a majority of the outstanding stock of the corporation entitled to vote thereon or, if the corporation is a nonstock corporation, by a majority of the members having the right to vote for the election of the members of the governing body, at a meeting duly called upon at least 20 days' notice. The notice of the meeting shall state that such a resolution will be considered.

8 Del.C. §271(a) (2006).

[29]In a later unpublished opinion, the *Geer* Court allowed the plaintiff to amend the claim against individual officers to proceed as a direct claim. *Geer v. Cox*, 2003 U.S. Dist. LEXIS 14885, *7-*8 (D.Kan. Aug. 20, 2003)("*Geer II*"). The amended claim in *Geer II* alleged that the individual defendants breached their fiduciary duties to the shareholders by failing to disclose or submit the proposed transfer of assets for approval to the shareholders, resulting in damages. *Id.* at *7. However, the vague claim for "damages" does not specify whether the plaintiffs in *Geer* sought damages in the form of a loss of stock value or payment of the fair value of the stock as of the date of the asset transfer.

Relying, in part, on *In re Tri-Star Pictures, Inc. Litig.*, 634 A.2d 319 (Del. Supr. 1993), the *Geer II* Court decided that the amended claim alleged a *special injury* involving the shareholders' right to vote. The "special injury" test of *Tri-Star* was rejected later in the *Tooley* decision by the Supreme Court of Delaware. *Tooley*, 845 A.2d at 1038-39. The *Tooley* Court wrote that:

[A] court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.

*Tooley*, 845 A.2d at 1039.

McGreevey O&D Claim arises apart from the injury to the corporation.[30]  Accordingly, I

conclude that Count 3 of the McGreevey Complaint, the McGreevey O&D Claim, asserts a

derivative claim.

3.    Can the Trustee assert derivative claims against the Insider Defendants arising from
      actions taken prior to the Restructuring as the successor in interest to Montana Power?

Count Three of the Trustee's Complaint asserts a claim on behalf of Touch America, as

successor to Montana Power, against Montana Power's officers and directors for breach of

fiduciary duties.[31]

In their Motion to Dismiss, the McGreevey Shareholders argue that the Trustee does not

have any right or standing to bring claims against Insider Defendants as a successor in interest to

Montana Power.  The McGreevey Shareholders argue that all of Montana Power's assets,

liabilities, rights and powers were transferred to and vested in MPLLC as the "surviving entity"

of the merger between those two entities and, as a result, MPLLC (and its successor entities)

own those rights, rather than Touch America.  In response, the Trustee argues that Touch

America was the "successor holding company" to Montana Power, claiming that the

---

[30]The McGreevey Shareholders argue that the McGreevey O&D Claim alleges a distinct injury
because the nature and amount of the shareholders' claims vary, not just in proportion to shareholdings,
but based upon other factors, such as the relationship of the dates of ownership to the timing of the
various sales.  However, the dates of share ownership do not alter the fact that an injury of loss of stock
value is an injury to the corporation, not just to individual shareholders.

[31]Pursuant to a Stipulation between the Plan Trustee and the Insider Defendants, which was
approved by Order of this Court dated November 26, 2008 (docket no. 94 in Adv. No. 04-54840), the
Fifth, Sixth and Seventh Claims for Relief of the Trustee's Complaint were dismissed, along with
portions of the Fourth Claim for Relief to the extent it "state[d] a claim based upon a breach of duty by
any of the [Insider] Defendants that allegedly occurred after February 15, 2002. . . ."  On December 11,
2008, the Trustee filed a Second Amended Complaint (docket no. 96 in Adv. No. 04-54840), which sets
forth four claims against the Insider Defendants, including the Third Claim for Relief, brought on behalf
of Touch America "in its own right and as successor to Montana Power, against Montana Power's
Directors and Officers for Breach of Duty."

Restructuring was not a typical two-party merger and that Touch America, as the new holding company, succeeded to the rights and liabilities of Montana Power that were "peculiar to the merged entity's status as the holding company." Alternatively, the Trustee argues that if the claims were merged into MPLLC, those claims were transferred to Touch America prior to closing on the sale of the "stripped down utility business" to NorthWestern under the UPA. Finally, the Trustee also argues that, by equitable subrogation, Touch America succeeded to any right of NorthWestern to bring claims arising out of the Divestiture or Restructuring.

We start with the premise asserted by all parties that the officers and directors of Montana Power, in performing certain acts (or omissions) in connection with the Restructuring and Divestiture, breached their fiduciary duties of care and loyalty to Montana Power and caused Montana Power to suffer damages. Montana Power had the right to assert these derivative claims prior to the Restructuring. The issue before the Court is which entity succeeded to those claims, first, as a result of the Restructuring, and, second, as a result of the sale under the UPA to NorthWestern.[32]

The right to pursue derivative claims against the Insider Defendants was a property right belonging to Montana Power prior to the merger. *Lewis v. Anderson,* 477 A.2d 1040, 1044 (Del. Supr. 1984). Pursuant to both Montana law and Delaware law, Montana Power's property right became the property of MPLLC, as the surviving entity, after the merger. *See* Mt. St. 35-8-1203

---

[32]The Trustee argues that the Honorable John L. Peterson already decided that NorthWestern and its affiliated entities are not the successor to Montana Power in his decision *NorthWestern Corp. v. McGreevey (In re NorthWestern Corp.),* 2005 WL 2847228 (Bankr.D.Del. Oct. 25, 2005). While the Trustee has shown that this issue was one of many argued before Judge Peterson and while the McGreevey Shareholders were enjoined from pursuing a fraudulent conveyance claim against NorthWestern, nothing in the October 25, 2005 opinion reflects any determination by Judge Peterson concerning whether NorthWestern or Touch America is the successor to Montana Power with respect to the derivative claims.

25

(1)(b)(2007) and Del.Code. Ann. tit. 8, §259 (2007).[33] *See also Lewis*, 477 A.2d at 1049-50

(deciding that Del.Code Ann. tit. 8 §261, which permits a cause of action against a corporation

that is party to a merger to proceed as if such merger had not taken place or by substituting the

surviving corporation in the proceeding, does not alter the effect of §259, which provides for

transfer of ownership of choses in action from the merged party to the surviving party);

*Travelers Ins. Co. v. Western Fire Ins. Co.*, 218 Mont. 452, 455, 709 P.2d 639, 641

(1985)(recognizing that, under Montana law, all the rights and privileges of the merged

corporation pass to the surviving corporation).

   The Trustee contends that, as part of the Restructuring, Touch America succeeded to

Montana Power's "holding company rights and liabilities," including the right to pursue

derivative claims against the Insider Defendants arising out of the Divestiture and Restructuring.

In support of this argument, the Trustee cites to Delaware case law discussing the effect of a

corporate merger on a derivative claim.  Generally, these decisions recognize that a merger

which eliminates a shareholder's ownership of stock also eliminates his status to bring or

---

[33]Mt.St. 35-8-1203 ("Effect of Merger") provides, in pertinent part:
(1) When a merger takes effect:

   (a)   the separate existence of each limited liability company and other entity that are a
         party to the merger, other than the surviving entity, terminates;

   (b)   all property owned by each of the limited liability companies and other entities
         that are a party to the merger vests in the surviving entity;

   (c)   all debts, liabilities, and other obligations of each limited liability company and
         other entity that are a party to the merger become the obligations of the surviving
         entity;

   (d)   an action or proceeding pending by or against a limited liability company or
         other entity that is a party to a merger may be continued as if the merger had not
         occurred or the surviving entity may be substituted as a party to the action or
         proceeding; and

   (e)   except as prohibited by law, all the rights, privileges, immunities, powers, and
         purposes of every limited liability company and other entity that are a party to
         the merger vest in the surviving entity.

*See also* Mt. St. 35-1-817(1)(b)(2007)(relating to merger of corporations).

26

maintain a derivative suit on behalf of the corporation, on the theory that, upon the merger, the

derivative rights pass to the surviving corporation which then has the sole right or standing to

pursue the

action.[34]  *Schreiber v. Carney*, 447 A.2d 17, 21 (Del.Ch. 1982).  *See also Lewis,* 477 A.2d at

1046; *Bonime v. Biaggini*, 1984 WL 19830, *2 (Del. Ch. Dec. 7, 1984).   Under this analysis, the

surviving corporation (here, MPLLC) owned the derivative claims post-merger, not Touch

America, the holding company.

It is well recognized that "a corporate parent which owns the shares of a subsidiary does

not, for that reason alone, own or have legal title to the assets of the subsidiary." *Dole Food Co.*

*v. Patrickson*, 538 U.S. 468, 475, 123 S.Ct. 1655, 1660, 155 L.Ed.2d 643 (2003).  As a result of

the Restructuring, Montana Power (and MPLLC) became wholly-owned subsidiaries of Touch

America.  Touch America's status as the "holding company," owning all of the shares of

Montana Power and MPLLC does not create a right to the subsidiaries' assets.

> A holding company is a corporate body with a concentrated ownership of shares
> of stock in another company, by which it exercises control, supervision or
> influence over the policies and management of the company whose shares it
> holds. . . . [A] holding company is generally held not to be doing or transacting

---

[34]If certain prerequisites are met, a shareholder or member may bring a derivative action as a representative of the interests of shareholders or members who are similarly situated. Fed.R.Civ.P. 23.1(a). *See also* Mt. St. 35-1-542 and Del.Stat.Ann. tit.8, §327. The Delaware cases cited by the Trustee also recognize two exceptions to the rule that a merger eliminates a shareholder's standing to maintain a derivative suit. The first exception is in the case of fraud, *i.e.*, when the shareholder asserts that the merger was a device to eliminate the derivative claim. *Lewis*, 477 A.2d at 1046 n.10; *Bonime*, 1984 WL 19830 at *2. The second exception is in the case of a "mere reorganization" that does not alter the shareholder's ownership of the business enterprise. *Id.; Schreiber*, 447 A.2d at 22. The Restructuring, which resulted in the Montana Power shareholders owning Touch America stock, *while Touch America was the sole owner of MPLLC*, is a reorganization which would fall within the "mere reorganization" exception discussed in *Schreiber*. However, the reorganization did not create any special "holding company rights" to the derivative claims, as asserted by the Trustee, transferring ownership of the claims to Touch America. Touch America's sale of its membership interest in MPLLC is in contrast to the facts in those cases.

> business through its subsidiary where the separate corporate entities are
> maintained. By the same token, the creation of a holding company does not affect
> the separate and continuing existence of the corporation whose shares it holds,
> nor is the situation altered simply because the shareholders, directors, and other
> officers of the two companies are identical.

6A Fletcher Cyclopedia of the Law of Corporations §2821 (2006). The Trustee's argument that

the Restructuring caused ownership of the derivative claims to pass to Touch America is not

supported by the law.

While the cases do not provide any support for concluding that a merger transfers

ownership of a derivative claim to a holding company, the Federal Rules of Civil Procedure

recognize that a holding company - - as the owner of the surviving corporation - - could have

standing to assert the derivative claims post-merger. *See* Fed.R.Civ.P. 23.1. Two days after the

Restructuring, however, NorthWestern and Touch America effectuated a sale of Touch

America's membership interest in MPLLC to NorthWestern, pursuant to the terms and

conditions set forth in the UPA. (Statement, ¶27). As a result of the sale, complete ownership of

MPLLC was transferred from Touch America to NorthWestern. There is nothing in this record

to support the conclusion that, despite Touch America's sale of its membership interest in

MPLLC, it retained any right to assert or maintain a derivative claim on behalf of MPLLC.[35]

Alternatively, the Trustee contends that MPLLC transferred all of its "non-energy" assets

---

[35]Both federal and state law regarding standing to bring derivative lawsuits require continuous ownership for the duration of the action. In *Lewis v. Chiles,*, the Ninth Circuit Court of Appeals explained:

> [A]s a practical matter, the continuous ownership requirement stems from the equitable nature of derivative litigation which allows a shareholder "to step into the corporation's shoes and to seek in its right the restitution he could not demand on his own," *Cohen v. Beneficial Loan Corp.,* 337 U.S. 541, 548, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949). This equitable principle reflects a shareholder's real interest in obtaining a recovery for the corporation which increases the value of his holdings.

*Lewis v. Chiles,* 719 F.2d 1044, 1047 (9th Cir. 1983).

(including the potential claims) to Touch America prior to the closing of the UPA because both

parties to the sale intended that only the utility business was being sold to NorthWestern. To

support this argument, the Trustee cites to section 2.28 of the UPA, which provides in pertinent

part:

> 2.28    Effect of Restructuring. ....[A]s a consequence of the Restructuring, as of
> the Closing Date, by operation of law pursuant to Section 35-1-817 and
> 35-8-1203 of the Montana Code Annotated (1999), the Company
> [MPLLC] will have succeeded to all of MPC's right, title and interest in
> the Assets and Properties of MPC and constituting the utility business of
> MPC (the "Utility Business"), as described in that certain Confidential
> Offering Memorandum dated May 2000 prepared by Goldman, Sachs &
> Co.

UPA, §2.28.[36] The Trustee maintains that §2.28 describes the parties' intent to sell only the

"Utility Business" to NorthWestern, which is defined in this section as including only the assets

and properties of MPC *that constituted the utility business*. The Trustee argues that the "Utility

Business" did not include any claims arising out of the Divestiture and Restructuring. In further

support of this argument, the Trustee relies, in part, upon documents attached to the Trustee's

Motion for Summary Judgment in Adv. No. 05-52206, including the following (i) minutes of a

telephonic meeting of the MP Board held on September 29, 2000, at which the Board approved

the sale of its transmission and distribution business to NorthWestern, and which discusses the

need for a restructuring that would separate the energy business for sale (Ex. J to the Declaration

of David J. Richardson in Support of Motion of Plan Trustee for Summary Judgment)(the

"Richardson Declaration")(docket no. 18 in adv. no. 05-52206); and a memorandum from

---

[36]A copy of the UPA was attached as Exhibit K to the Declaration of Brent Williams in Support
of the Motion of Plan Trustee for Summary Judgment (docket no. 39)(Ex. D to the Trustee Summary
Judgment Motion). This copy did not include a copy of the Confidential Offering Memorandum or other
schedules referred to in the UPA.

attorneys discussing the steps for the Restructuring (Ex. N to the Richardson Declaration, docket no. 15 in adv. no. 05-52206).

In further support of his argument, the Trustee relies upon the provisions of the UPA in which Touch America agrees to indemnify NorthWestern for any "adverse consequences" arising from the Divestiture and Restructuring. (see UPA, §10.02). The Trustee argues that by undertaking to indemnify NorthWestern, Touch America is equitably subrogated to NorthWestern and succeeds to any claims which NorthWestern might hold against the Officers and Directors. See Blue Cross and Blue Shield of New Jersey v. Philip Morris, Inc., 138 F.Supp.2d 357, 363-64 (E.D.N.Y. 2001).

The succession issue arises in the McGreevey Shareholders Motion to Dismiss the Trustee's Complaint. However, pursuant to Fed.R.Civ.P. 12(d), made applicable hereto by Fed.R.Bankr.P. 7012, the motion shall be treated as a motion for summary judgment under Fed.R.Civ.P. 56 because matters outside the pleadings have been presented and are being considered by the Court.

Because the McGreevey Shareholders' brought a proper summary judgment motion, the burden shifts to the Trustee.[37] The Trustee "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Before a court will find that a dispute about a material fact is genuine, there must be sufficient evidence upon which

---

[37]Once the moving party has made a proper motion for summary judgment, the burden shifts to the non-moving party, pursuant to Rule 56(e), which states, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed R. Civ. P. 56(e); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The court must view the facts and draw inferences in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513-14. "[W]here the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co.*, 24 F.3d 508, 512 (3d Cir. 1994). It is not the role of the judge to weigh the evidence or to evaluate its credibility, but to determine "whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Viewing the facts and drawing inferences arising therefrom in the light most favorable to the Trustee, I conclude that there are unresolved issues of material fact, including primarily: (i) whether the officers and directors stripped MPLLC of all assets that were not related to the utility business prior to closing on the UPA and transferring ownership of MPLLC to NorthWestern, and (ii) whether Touch America is equitably subrogated to any claims of NorthWestern against the officers and directors. Accordingly, the McGreevey Shareholders' Motion to Dismiss will be denied.

4.    Can the Trustee assert derivative claims against the Insider Defendants arising from actions taken prior to the Restructuring on behalf of Entech LLC?

The First Claim in the Trustee's Complaint asserts a claim on behalf of Entech LLC against Entech's officers and directors for breach of fiduciary duties of care and loyalty in selling the energy assets of Entech. The McGreevey Shareholders argue that only Montana Power, as the parent corporation of Entech, had the right to pursue claims against Entech's officers and directors for a breach of fiduciary duties and, therefore, these claims also became property of MPLLC upon the merger.

In *Andarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171, 1174 (Del.

31

Supr. 1988), the Supreme Court of Delaware stated that, "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders." More specifically, the *Andarko* Court held that, under Delaware corporate law, the subsidiary's directors did not owe a fiduciary duty to prospective shareholders after the parent corporation declares its intention to spin-off the subsidiary and before the date of distribution. *Andarko, 545 A.2d at 1172.* Later courts have rejected the overly broad reading of *Andarko* proposed by the McGreevey Shareholders here. *Claybrook v. Morris (In re Scott Acquisition Corp.)*, 344 B.R. 283, 287 (Bankr.D.Del. 2006) citing *First Am. Corp. v. Al-Nahyan*, 17 F.Supp. 2d 10, 26 (D.D.C. 1998) ("the proposition that a wholly-owned subsidiary's director's fiduciary duties flow only to the parent corporation . . . overstates the 'narrow confines' of the [*Anadarko*] court's holding."); *In re Mirant Corp.,* 326 B.R. 646, 651 (Bankr. N.D.Tex. 2005)(rejecting an "overly-broad reading of *Anadarko*.").

Accordingly, the directors of a wholly-owned subsidiary owe fiduciary duties to both the subsidiary and to the sole shareholder, the parent corporation. Therefore, the right to bring derivative claims against the directors of Entech would be held by Entech, Inc., which right passed to Entech, LLC, as surviving corporation of the merger. Once Montana Power gave up ownership of Entech, LLC, it lost its ability to pursue the derivative claims. Touch America, as the sole owner of Entech, LLC, has standing to assert the derivative claims.

5.    Whether the Trustee is entitled to an injunction to prevent the McGreevey Shareholders from pursuing the McGreevey O&D Claim?

The Trustee seeks summary judgment to permanently enjoin the McGreevey Shareholders from pursuing the McGreevey O&D Claim under Bankruptcy Code Section 105,

which provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a).

The Court of Appeals for the Third Circuit recognized that other courts have concluded that a bankruptcy court has authority under §105 to enjoin actions from proceeding in a state court against third parties "where failure to enjoin would affect the bankruptcy estate." *I.R.S. v. Kaplan (In re Kaplan)*, 104 F.3d 589, 595 (3d Cir. 1997). The Trustee argues that the McGreevey Shareholders must be enjoined from pursuing the derivative claims because the filing of the bankruptcy extinguishes a shareholder's right to maintain a derivative action; upon filing, the claims become part of the bankruptcy estate and the trustee or debtor-in-possession becomes vested with exclusive authority to pursue the derivative claims. *Skolnick v. Atlantic Gulf Communities Corp. (In re General Development Corp.)*, 179 B.R. 335, 338-39 (S.D.Fla. 1995). *See also In re RNI Wind Down Corp.*, 348 B.R. 286, 293 (Bankr.D.Del. 2006)("Upon the filing of a bankruptcy petition . . . claims for injury to the debtor from actionable wrongs committed by the debtor's officers and director become property of the estate under 11 U.S.C. §541 and the right to bring a derivative action asserting such claims vests exclusively to the trustee.").

The McGreevey O&D Claim is derivative. However, for the reasons set forth above, there are issues of material fact regarding whether Touch America succeeded to the derivative claims of Montana Power and MPLLC. Until those issues are resolved and it is determined whether the McGreevey O&D Claim affects the bankruptcy estate's rights, the Trustee is not entitled to an injunction under §105.

## CONCLUSION

The McGreevey O&D Claim is a derivative claim. However, because there are issues of material fact regarding whether Touch America succeeded to the derivative claims of Montana Power, the Trustee is not entitled to an injunction. For the reasons set forth above, the McGreevey Shareholders' Motion to Dismiss and Motion to Certify Issues are denied. The Trustee's Motion for Summary Judgment is granted, in part, on the issue of whether the McGreevey O&D Claim is a derivative claim. However, the Trustee's Motion for Summary Judgment is denied, in part, regarding the Trustee's request for an injunction until resolution of the issues of material fact regarding whether Touch America succeeded to the rights of Montana Power and MPLLC to assert the derivative claims.

An appropriate order follows.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: February 3, 2009